UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-60221-CR-ZLOCH

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                    **ORDER DENYING**
**MOTION TO SUPPRESS**

ROBERT JOSEPH VALERIO and
KEVIN LLOYD LECHLEITNER,

      Defendants.

_____/

    THIS MATTER is before the Court upon Defendant Robert Valerio's Motion To Suppress Evidence And Statements Obtained As A Result Of An Illegal Search And Seizure And Request For Hearing (DE 35). The Court has carefully reviewed said Motion, the entire court file and is otherwise fully advised in the premises.

    Defendant Robert Joseph Valerio is charged along with Co-Defendant Kevin Lloyd Lechleitner in a one-count Indictment (DE 17) with knowingly and intentionally manufacturing a controlled substance, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. The Indictment further alleges, pursuant to 21 U.S.C. § 841(b)(1)(B), that said violation involved 100 or more marijuana plants. On December 2, 2011, Defendant Lechleitner entered a plea of guilty to the one-count Indictment. See DE 45.

    By the instant Motion (DE 35), Defendant Valerio seeks to suppress the evidence of marijuana plants taken from warehouse bays 15 and 16 in a warehouse complex located at 109 S.E. 3rd Court,

Deerfield Beach, Florida, and Mr. Valerio's statements taken after he was allegedly illegally stopped by law enforcement.  For the reasons set forth below, the Court will deny the instant Motion.

The Court held an evidentiary Hearing on Defendant's Motion (DE 35) on January 17, 2012.  At said Hearing, the Court heard testimony from three witnesses on behalf of the Government and two witnesses on behalf of Defendant Valerio.  Defendant also introduced evidence at the Hearing, including two demonstrative photographs of Defendant's house and street as it appeared on August 24, 2011, and the August 24, 2011, arrest warrant to search bay 14 at 109 S.E. 3rd Court, Deerfield Beach, Florida.

<u>I. Background</u>

The testimony at the Hearing revealed that law enforcement commenced an investigation of Defendant Valerio during a surveillance operation at a hydroponics store.  The ensuing investigation ultimately led to the discovery of a marijuana grow operation at a warehouse in Deerfield Beach, Florida.

<u>A. The July 27, 2011, Surveillance</u>

On or about July 27, 2011, Special Agent David Lee Hibbs with the Drug Enforcement Administration (hereinafter "DEA") was conducting surveillance at a retail establishment known as Green Touch Hydroponics in Davie, Florida.  DE 60 at p. 5, ln. 21-51; <u>id.</u> at p. 6, ln. 1-8.  As revealed during his cross examination, the date the relevant surveillance commenced in this case is disputed.

An affidavit Agent Hibbs created in his application for the August 24, 2011, search warrant at issue in this case indicates that the initial surveillance occurred on or about August 2, 2011.  Id. at p. 28, ln. 23-25; Defendant's Exhibit 1, p. 2.  Nonetheless, as Agent Hibbs explained during the Hearing, Green Touch Hydroponics specializes in selling equipment for growing plants, including vegetables, indoors.  Id. at p. 28, ln. 23-25; id. at p. 25, ln. 8-10.  Yet, because the products sold at the store are also conducive to the cultivation of marijuana, Agent Hibbs was conducting surveillance near the store to gather intelligence on persons who have "a high probability of [] conducting criminal acts, such as growing marijuana."  Id. at p. 6, ln. 20.  Based on his twenty years of experience in the field of drug enforcement, Agent Hibbs testified that a number of criminal investigations have resulted from similar kinds of surveillance.  Id. at p. 6, ln. 18-21.

During the surveillance, Agent Hibbs was positioned in his vehicle to the north side of the back of the Green Touch Hydroponics store, with a direct view of the back entrance of the establishment, approximately 70-80 yards away from the entrance.  Id. at p. 7, ln. 7-12.  The Agent's suspicions first arose when he witnessed a black early-model Chevy truck turn around the corner from the back side of the store.  Id. at p. 8, ln. 1-11.  Of importance, the Agent noted that the vehicle had no license plate,

id. at p. 8, ln. 14;[1] it backed into a parking space presumably to conceal the lack of a license plate, id. at p. 9, ln. 7-12; and affixed on the back window was a distinctive sticker that read "Pull your pants up and get a job, fool" id. at p. 10, ln. 11-13. The Agent then noticed an individual, later confirmed to be Defendant Valerio, walk into the back entrance of the store, stay there for 15-20 minutes, and then leave carrying a white plastic shopping bag. Id. at p. 10, ln. 16-23.

As Agent Hibbs explained, his suspicions regarding Defendant Valerio continued to rise as Valerio exited the parking lot in his vehicle. Defendant took the far southwest exit, as opposed to the main exit on the East side of the parking lot, and continued to proceed north. Id. at p. 12, ln. 3-11. Agent Hibbs followed Defendant in Hibbs' own vehicle, and observed as Defendant headed East on Griffin Road, and then made a U-turn to head North again. Id. at p. 13, ln. 1-8. This behavior, combined with the fact that Defendant was "glued to his rearview mirror" during the time Agent Hibbs was following Defendant, indicated to Hibbs that Defendant was concerned about law enforcement possibly following him. Id. at p. 13, ln. 14-24. Next, Agent Hibbs noticed Defendant pull over to

---

[1]This fact was also disputed on cross examination, as the search warrant indicates that the license plate was "bent over, obscuring the tag." Defendant's Exhibit 1, at p. 2. Agent Hibbs testified that this misstatement was due to a miscommunication between himself and Detective Ambrose when applying for the search warrant. DE 60, at p. 31, ln. 20-23.

the right shoulder of the road, walk toward the rear of the vehicle with what appeared to be a license plate in his hand, and bend down to where the license plate would normally be affixed.  <u>Id.</u> at p. 14, ln. 11-21.  At this point Agent Hibbs passed Defendant and so could not see what Defendant in fact did with the license plate. <u>Id.</u>  Agent Hibbs observed Defendant drive west, and because Agent Hibbs had been driving north, he ended surveillance.  <u>Id.</u> at p. 15, ln. 4-9.

## B. The August 17, 2011, Surveillance

On August 17, 2011, Agent Hibbs was again conducting surveillance at Green Touch Hydroponics.  <u>Id.</u> at p. 15, ln. 15-19. Shortly after 5:00 p.m., Agent Hibbs observed Defendant drive into the parking lot in the same black truck.  <u>Id.</u> at p. 15, ln. 21-25. According to Agent Hibbs, Defendant's vehicle again had no license plate, but it did have the same identifying sticker——"Pull your pants up and get a job, fool"——on the rear window.  <u>Id.</u> at p. 16, ln. 1-8.  The vehicle again backed in to a parking space directly behind the back door of the store.  <u>Id.</u> at p. 16, ln. 9-10. Because Agent Hibbs recognized the same vehicle as the one he was following on the prior occasion, Hibbs requested further assistance from law enforcement, including the assistance of Agent Joseph Ahearn of the Drug Enforcement Administration.  <u>Id.</u> at p. 16, ln. 4-12; <u>id.</u> at p. 62, ln. 9-19.  Agent Hibbs observed Defendant enter the store and remain there for 20 minutes.  <u>Id.</u> at p. 16, ln. 25.

After Defendant left the store, he again exited the parking lot from the far west exit and traveled north. Id. at p. 17, ln. 21-25. Defendant then traveled to a 7-11 Store, at which time Agent Hibbs positioned his vehicle in the parking lot next to the 7-11 store. Id. at p. 18, ln. 4-7. When he parked his vehicle, Agent Hibbs observed Defendant in the rear area of the truck, near where the license plate would be, although he could not see whether he was affixing a license plate to his truck. Id. at p. 18, ln. 14-18; id. at p. 19, ln. 4-7. According to Agent Hibbs, one of the other Agents who was engaging in surveillance saw that after Defendant left the 7-11, there was a license plate affixed to the truck. Id. at p. 19, ln. 1-3.

Once the Agents observed the license plate number, they ran the number and found Defendant's name and driver's license photo. Id. at p. 19, ln. 12-18. The Agents then followed Defendant's vehicle from the 7-11 as it proceeded north on State Road 95, until it reached a warehouse in Deerfield Beach. Id. at p. 19, 22-25; id. at p. 20, ln. 1-15. As Agent Hibbs testified, it was notable that Defendant drove to a warehouse, as these buildings are "suitable" for conducting grow operations in that they offer more space than a residence, they can often be rented under a name different than one's own, and they can be easily configured for marijuana grow operations. Id. at p. 20, ln. 20-25. At the warehouse, the Agents observed Defendant park near bay 15 and walk

6

toward the warehouse.  Id. at p. 21, ln. 4-22.  Defendant remained at the location about one hour until he traveled to a tobacco shop. Id. at p. 22, ln. 1-9.  At this point, surveillance ended.  Id.

### C. The Surveillance and Investigation of Bay 14

As Agent Ahearn testified, a few days after the Agents followed Defendant Valerio to the warehouse, Agent Ahearn, Agent Hibbs, and Special Agent Richard Lohse conducted surveillance near bay 15.  Id. at p. 67, ln. 4-13; id. at p. 83, ln. 4-5.  The Agents noticed that one of the warehouses near bay 15, which later was identified as bay 14, had bright lights emanating from behind the door.  Id. at p. 9-13.  Several days after this episode, a Broward County Sheriff's Office K-9 was brought to the warehouse, at which time the K-9 unit alerted to bay 14.  Id. at p. 68, ln. 8-10.

A search warrant was later obtained for bay 14.  Id. at p. 68, ln. 11-15.  On August 24, 2011, the search warrant was executed on bay 14.  Id.  No grow operation was found within that bay; yet, a small amount of marijuana was found in neighboring bay 13.[2]  Id. at p. 160, ln. 16-18.  In fact, both bays 13 and 14 are owned by Jeremy Staska, who operated a recording studio in the bays.  Id. at p. 153, ln. 1-16.

---

[2]The search warrant, Defendant's Exhibit 1, indicates that the warrant was issued specifically for bay 14, and no testimony at the Hearing indicated that bay 13 was searched.  Yet, testimony from Mr. Staska on cross examination revealed that a small amount of marijuana and MDMA were found in bay 13; thus, they were presumably found when Mr. Staska was being interviewed by law enforcement.

Mr. Staska testified at the Hearing.  Regarding Defendant Valerio, Mr. Staska testified that he had seen Valerio around the warehouse bays before, sometimes feeding the cats, and that he believed Valerio was friends with a mechanic who works in one of the front bays.  Id. at p. 156, ln. 4-13.  Mr. Staska also stated that he relayed this information to law enforcement when he was interviewed by them.  Id.  As Mr. Staska testified, the bays are structured such that the front bays, 1 - 10, are connected to bays 11 - 20 which are positioned directly behind the front bays.  Id. at p. 157, ln. 17-25.

Mr. Staska also detailed the operation of his recording studio.  As he testified, various bands would use his recording studio at all hours of the night, and thus it would not be unusual for bright lights to be emanating from bay 14 in the early morning hours, just as the Officers observed.  Id. at p. 162, ln. 14-25. Further, Mr. Staska estimated that one out of every three bands that comes into the studio brings marijuana to smoke.  Id. at p. 162, ln. 3-4.

D. The August 24, 2011, Encounter with Defendant Valerio

On August 24, 2011, after the fruitless search of bay 14, Agent Ahearn and Detective Lopez of the Broward County Sheriff's Office were sent to Valerio's home.  Id. at p. 68, ln. 24-25. Detective Lopez testified that he was directed by Detective Ambrose to conduct a "voluntary citizen encounter."  Id. at p. 143, ln. 17-

8

22.  When the Officers arrived at Valerio's home, they observed his vehicle parked in the driveway facing out, with the back end of the truck where the license plate would be affixed against the building.  Id. at p. 70, ln. 1-3.  The Officers waited for approximately fifteen minutes, until Defendant Valerio left his residence.  Id. at p. 86, ln. 18-21.  When Defendant exited his residence, Detective Lopez positioned his vehicle, which was unmarked, in front of Defendant's vehicle and the driveway.  Id. at p. 70, ln. 20-23; id. at p. 71, ln. 24.  According to Agent Ahearn and Detective Lopez, the Officers' vehicle was parked only partially in front of the driveway, leaving room for Defendant Valerio to have pulled his own vehicle out of the driveway.  Id. at p. 71, ln. 4-17; id. at p. 116, ln. 17-18.  Yet, as Agent Ahearn admitted, the reason for partially blocking the driveway was to ensure Mr. Valerio would not leave.  Id. at p. 87, ln. 19-25.

A neighbor of Defendant Valerio's, Sarah Nicole MacDonald, testified at the Hearing as to her observations regarding the positioning of the Officers' vehicle.  She testified that she and her mother were walking in the street during the interaction between Defendant Valerio and the Officers.  Id. at p. 166, ln. 6-10.  The two then went into a friend's house, across the street from Defendant Valerio's, and observed Defendant and the Officers from the window.  Id. at p. 167, ln. 1-14.  At this time, Ms. MacDonald says that she saw three or four police cars.  Id. at p.

168, ln. 1.  Defendant introduced two Exhibits depicting the front of Defendant Valerio's home.  <u>Id.</u> at p. 168, ln. 5-18.  Using the Exhibits, she testified that one police vehicle was blocking Defendant Valerio's driveway, one vehicle was north of that first vehicle and blocking half of the neighbor's driveway, and the third vehicle was blocking Defendant Valerio's mailbox and part of his driveway.  <u>Id.</u> at p. 171, ln. 3-7.  According to Ms. MacDonald, those vehicles were "blocking the exit" and were positioned there for over an hour.  <u>Id.</u> at p. 173, ln. 20-25.

Once Defendant Valerio exited his residence, Agent Ahearn recalls getting out of the police vehicle and approaching Defendant.  <u>Id.</u> at p. 71, ln. 18-21.  He was dressed in street clothes, yet he had a bulletproof vest, with a black placard stating "Police," on over his clothes.  <u>Id.</u> at p. 72, ln. 1-2; <u>id.</u> at p. 89, ln. 12-16.  Agent Ahearn testified that he was concerned for his safety and so while approaching Defendant and identifying himself as law enforcement, he drew his weapon and held it at a "low rate position," requested that Defendant Valerio get out of his car, and show his hands.  <u>Id.</u> at p. 72, ln. 4-12; <u>id.</u> at p. 72, ln. 18-21.  According to both Agent Ahearn and Detective Lopez, Agent Ahearn did not raise his voice when making these requests to Defendant Valerio.  <u>Id.</u> at p. 117, ln. 10-11.  Upon noticing that Defendant Valerio was compliant and non-confrontational, Agent Ahearn holstered his weapon.  <u>Id.</u> at p. 72, ln. 12-14.  Agent

Ahearn then escorted Defendant Valerio to the front of the police vehicle in order to question him.  Id. at p. 74, ln. 2-4.  Before beginning questioning, Agent Ahearn conducted a complete "pat down" of Defendant Valerio, in an attempt to determine whether he was carrying any weapon or firearm.  Id. at p. 99, ln. 6-25.  No weapons were found on Defendant's person.  Id. at p. 100, ln. 14-17.

The Officers asked Defendant if he "operated any warehouses" in the area.  Id. at p. 74, ln. 2-9.  Defendant initially responded that he did not, but then later admitted that he did have a warehouse in Deerfield Beach.  Id.  Detective Lopez then inquired as to whether there was marijuana growing inside the warehouse bays, to which Defendant Valerio responded affirmatively.  Id. at p. 74, ln. 12-14.  At that point, Defendant Valerio was advised of his Miranda rights, and he agreed orally and through a written agreement to consent to a search of his residence and the relevant warehouse bays in Deerfield Beach.  Id. at p. 75, ln. 1-14; id. at ln. 119, ln. 23-25.  Defendant Valerio also advised that there were firearms in the truck and at the residence and a small amount of marijuana in the residence.  Id. at p. 75, ln. 17-21; id. at p. 76, ln. 15.  During this interaction, Mr. Valerio's wife exited the residence, and cooperated calmly with law enforcement.  Id. at p. 75, ln. 6-11.

During the interaction with the Valerios, the Officers

requested that another Officer be present, and Officer Grant was called to the scene. Id. at p. 77, ln. 3-9. According to Agent Ahearn, and in contrast to the testimony of Ms. MacDonald, there were only two police cars present at the Valerio residence during the entire encounter. Id.

After Defendant Valerio spoke with the Officers, he agreed to accompany both Agent Ahearn and Officer Lopez to the warehouse located at 109 S.E. 3rd Court, Deerfield Beach, Florida. Id. at p. 77, ln. 14-18. During the car ride to the warehouse, Defendant Valerio was neither handcuffed nor placed under arrest. Id. at p. 78, ln. 1-3. Defendant Valerio explained to the Officers his reasons for starting the grow operation. Id. at p. 122, ln. 7-12. During the conversations at the residence and on the way to the warehouse, Defendant Valerio was calm and cooperative. Id. at p. 122, ln. 13-16. After arriving at the warehouse located at 109 S.E. 3rd Court, Deerfield Beach, Florida, Detective Lopez reiterated to Defendant that he had been read his Miranda rights, and Defendant gave a taped statement to the Officers. Id. at p. 123, ln. 11-17. During this statement, Defendant agreed that he was treated with respect by law enforcement. Id. at p. 124, ln. 20-25; id. at p. 125, ln. 1. After a search of warehouse bays 5, 15, and 16 was conducted, Defendant Valerio was handcuffed and taken away in a marked police vehicle. Id. at p. 123, ln. 2-7.

12

## II. Analysis of the Stop and Seizure

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV.  The "touchstone of the Fourth Amendment is reasonableness," as determined by an examination of the totality of the circumstances.  Katz v. United States, 398 U.S. 347, 360 (1976).  Under the exclusionary rule, if evidence is obtained in violation of the Fourth Amendment——"including the direct products of police misconduct and evidence derived from the illegal conduct, or fruit of the poisonous tree"——the court may find the evidence inadmissible in a later criminal prosecution against the defendant. United States v. Perkins, 348 F.3d 965, 969 (11th Cir. 2003) (internal citations and quotation marks omitted).

In bringing a Motion to Suppress, the movant must establish an expectation of privacy in the area searched and establish that the search and seizure took place without a search warrant.  United States v. Bachner, 706 F.2d 1121, 1125-26 (11th Cir. 1983).  Once the movant has established these requirements, "the burden of proof shifts to the state to establish that an exception to the search warrant requirement was applicable in the subject case and that the

13

search and seizure was, in fact, a reasonable one." Id. (citing Coolidge v. New Hampshire, 403 U.S. 443 (1961)). In the context of a suppression hearing, the Court should impose no greater burden than "proof by a preponderance of the evidence" that the Government's conduct was permissible under the Fourth Amendment. Nix v. Williams, 467 U.S. 431, 444 n. 5 (1984).

## A. Terry Stop

The Government has argued that the stop of Defendant Valerio on August 24, 2011, was one within the meaning of Terry v. Ohio, 392 U.S. 1 (1968). DE 60, at p. 145, ln. 10-11. Therefore, the Court will first consider whether there was reasonable suspicion for the Officers to conduct a Terry stop of Mr. Valerio.

Generally, an individual may not be detained absent probable cause that he has committed a crime. However, the Supreme Court has created an exception to that rule "in the context of 'necessarily swift action predicated upon the on-the-spot observations of the officer on the beat.'" United States v. Williams, 619 F.3d 1269, 1270-71 (11th Cir. 2010). Thus, "'where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot,' the officer may briefly stop the persons involved to confirm or dispel his suspicions." Id. (citing Terry, 392 U.S. at 20). To show that there was a reasonable, articulable suspicion that criminal activity was afoot, the officer must be

14

able to "articulate more than an 'inchoate and unparticularized suspicion or 'hunch' of criminal activity.'" United States v. Gordon, 231 F.3d 750, 754 (11th Cir. 2000) (quoting Terry, 392 U.S. at 27). Further, while "'reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop.'" Id. (citing Jackson v. Sauls, 206 F.3d 1156, 1165 (11th Cir. 2000)). Finally, a reasonable suspicion is determined from "the totality of the circumstances and collective knowledge of the officers" and the question is "'not whether a specific arresting officer . . . actually and subjectively had the pertinent reasonable suspicion, but whether, given the circumstances, reasonable suspicion objectively existed to justify such a search.'" United States v. Nunez, 455 F.3d 1223, at 1226 (11th Cir. 2006) (quoting Hicks v. Moore, 422 F.3d 1246, 1252 (11th Cir. 2005)). Courts may determine whether reasonable suspicion existed based on "commonsense judgments and inferences about human behavior." Gordon, 231 F.3d at 756.

When viewing the totality of the circumstances, the Eleventh Circuit has held that reasonable suspicion may be based on the observance of "exclusively legal activity." Gordon, 231 F.3d at 754. Further, "nervous, evasive behavior" has been found to be a "pertinent factor" when determining whether reasonable suspicion

existed.  Id. at 765.   Thus in Gordon, the Eleventh Circuit determined that there was reasonable suspicion to stop the defendant when, in an area known for violent crime, the defendant was sighted standing within ten feet of a parked car and as soon as police approached, the defendant's eyes "lit up" and he moved quickly to another car in an attempt to evade the officers.  Id. at 756.   While getting into a vehicle upon the presence of law enforcement may not be sufficient to justify reasonable suspicion on its own, it was this fact, coupled with the defendant's eye contact with the officer, immediate subsequent evasive behavior, and the officer's knowledge of the dangerous nature of the neighborhood that amounted to reasonable suspicion.  Id.

In another case, the Eleventh Circuit found a Terry stop was justified when several factors, taken in the aggregate, created reasonable suspicion.  United States v. Powell, 222 F.3d 913 (11th Cir. 2000).  In Powell, law enforcement was conducting surveillance at the home of a "known drug dealer" and observed the defendant and a friend arrive at the residence.  Id. at 915.  The defendant went to the garage door of the residence instead of the front door, entered the residence and then left with the same backpack.  Id. at 917.  She then returned to the automobile wherein she and the friend made a short trip through the neighborhood.  Id.  She then made a trip back to the house, entering the residence with the backpack, and leaving with it as well.  Id.  The Eleventh Circuit

found that it was a reasonable inference for law enforcement to believe a drug transaction had taken place and that the defendant had been carrying currency and perhaps narcotics in the backpack. Id. Thus, as the Eleventh Circuit reiterated, "[w]hile none of these factors, by themselves, necessarily justifies an investigatory stop, they are each relevant in the determination of whether the agents had reasonable suspicion to stop [the defendant]. . . . Even in Terry, the conduct justifying the stop was ambiguous and susceptible of an innocent explanation." Id. at 918 (quoting United States v. Cruz, 909 F.2d 422, 424 (11th Cir. 1989); Illinois v. Wardlow, 528 U.S. 119, 125 (2000)).

As noted above, the location in which the defendant is being investigated may be one factor leading to reasonable suspicion justifying a Terry stop. The Supreme Court has held that "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime. But officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." Wardlow, 528 U.S. at 124. Thus, in Wardlow, the fact that the defendant was in an "area of heavy narcotics trafficking" was relevant as one factor in the determination of reasonable suspicion. Id. See also United States v. Franklin,

17

323 F.3d 1298, 1301 (11th Cir. 2003) (the defendant's presence in a "problem area" late at night, combined with the circumstances of his flight from police amounted to reasonable suspicion); United States v. Hunter, 291 F.3d 1302, 1306 (11th Cir. 2002) (the fact that defendant was in a "hot spot" for criminal activity and positioned near illegal gambling activity was probative of reasonable suspicion); Gordon, 231 F.3d at 756 (that the defendant was in a neighborhood known for violent crime was relevant in the court's determination of reasonable suspicion).

Here, when viewing all of the factors together, the Court finds that the Officers had reasonable suspicion justifying a Terry stop of Defendant Valerio. First, Defendant was observed twice at a hydroponics store as part of a DEA investigation into marijuana grow operations in the area. DE 60, at p. 6 ln. 20. While the store and its operation are entirely legal and patrons may visit the store to make legal purchases, Agent Hibbs testified that in his experience, a number of investigations involving illegal grow operations have developed out of similar kinds of surveillance. Id. at p. 6, ln. 18-21. This is because persons who frequent the store may have a higher probability of involvement in marijuana cultivation. Id. Thus, the presence of Defendant at the Green Touch Hydroponics on more than one occasion is one factor the Court finds pertinent in determining whether reasonable suspicion existed. Wardlow, 528 U.S. at 124; Gordon, 231 F.3d at 756; see

also <u>United States v. Jones II</u>, 2010 WL 2520158, at *5 (D. Kan. June 15, 2010) (holding that the fact the defendant exited from a hydroponics store carrying a plastic sack was one factor creating reasonable suspicion to stop the defendant). Further, the location Defendant eventually drove to on August 17, 2011—a warehouse—is also indicative of his possible involvement in a drug operation. As Agent Hibbs testified, warehouses are suitable for grow operations because they offer sufficient space, they can be easily configured for growing marijuana, and they can often be rented under a name other than one's own. DE 60, at p. 20, ln. 20-25.

The Court also heard testimony at the Hearing regarding Defendant Valerio's evasive behavior surrounding the investigation of him. On both of the instances Defendant was observed at Green Touch Hydroponics, he arrived in the parking lot from the back side of the store. DE 60, at p. 8, ln. 14; <u>id.</u> at p. 16, ln. 1-8. On both occasions Defendant also backed into the parking space against the store, presumably to conceal his license plate or lack thereof. <u>Id.</u> at p. 9, ln. 7-12; <u>id.</u> at p. 16, ln. 9-10. He also exited the parking lot on both occasions from the far southwest exit as opposed to the main exit. <u>Id.</u> at p. 12, ln. 3-11. On the first occasion of surveillance, Defendant seemed to drive in a manner indicating his attempt to evade anyone who might be following him, in particular, law enforcement—by traveling away from his route heading North, and then circling back to head North again. <u>Id.</u> at

p. 13, ln. 1-8; id. at p. 17, ln. 21-25.  This circuitous route, combined with the fact that Defendant was "glued to his rearview mirror" the entire time, indicates his awareness and sensitivity to the possible presence of law enforcement.  Id. at p. 13, ln. 14-24.

Finally, and the single most important factor justifying the stop in this case, is Defendant's lack of a license plate on his vehicle and his behavior in presumably replacing the license plate after leaving the hydroponics store.  During the July 27, 2011, surveillance and after Defendant left the store, Agent Hibbs observed Defendant pull to the right shoulder of the road and walk toward the rear of his vehicle.  Id. at p. 14, ln. 11-21.  Though this occurred while Agent Hibbs was passing Defendant and thus Hibbs did not actually see Defendant replace his license plate, Agent Hibbs testified that he saw what appeared to be a license plate in Defendant's hand and he observed Defendant bend down to where the license plate would be affixed.  Id.  Further, during the August 17, 2011, surveillance, Defendant again entered the store parking lot without a license plate.  Id. at p. 16, ln. 1-8.  After Defendant left the store and parked in the 7-11 parking lot, Agent Hibbs observed Defendant in the rear of the truck, near where a license plate would be.  Id. at p. 18, ln. 14-18.  Further, Agent Hibbs testified that one of the other Agents observed that after Defendant left the 7-11, there was a license plate affixed to the truck.  Id. at p. 19, ln. 1-3.  This explains why the Agents were

then able to use the license plate number to obtain Defendant's name and driver's license photo. Id. at p. 19, ln. 12-18.

Defendant's lack of a license plate and his behavior in presumably replacing the license plate are indicative of the type of evasive behavior that can amount to reasonable suspicion. Gordon, 231 F.3d at 756. Further, the determination of reasonable suspicion may be based on "commonsense judgments and inferences about human behavior." Id. In this case, one can easily infer that Defendant was attempting to evade law enforcement by removing his license plate when at the hydroponics store. Even if the Court were to accept the facts as stated in the search warrant, that the license plate was "bent over, obscuring the tag," that would also indicate an attempt by Defendant Valerio to evade law enforcement. Defendant's Exhibit 1, at p. 2. The act of later replacing the license plate (or unbending it so its markings would be visible) further shows that Defendant only allowed his license plate to be readily observable once he assumed he had successfully evaded the eye of law enforcement. See also United States v. Tuley, 161 F.3d 513, 515 (8th Cir. 1998) (holding that a Terry stop was justified when, among other considerations, the defendant's vehicle had no license plate and the investigating officer "knew criminals often hid[e] their identity by removing license plates from their vehicle.").

Thus, based on a consideration of the totality of the

circumstances, the Court finds that there was reasonable suspicion justifying the stop of Defendant Valerio on August 24, 2011.

B. The Propriety of the Terry Stop

Next, the Court will consider whether the Officers' conduct surrounding the stop of Defendant on August 24, 2011 elevated the Terry stop to an arrest, requiring probable cause. "At some point in the investigative process, police procedures can qualitatively and quantitatively be so intrusive with respect to a suspect's freedom of movement and privacy interests as to trigger the full protection of the Fourth and Fourteenth Amendments." Hayes v. Florida, 470 U.S. 811, 815-16 (1985). Thus, in the second prong of the Terry inquiry, the court will consider whether the stop was "reasonably related in scope to the circumstances which justified the inference in the first place." United States v. Acosta, 363 F.3d 1141, 1144 (11th Cir. 2004) (quoting Terry, 392 U.S. at 20)).

There is no bright-line rule for differentiating between investigatory stops and arrests. "[W]hether a seizure has become too intrusive to be an investigatory stop and must be considered an arrest depends on the degree of intrusion, considering all the circumstances." United States v. Blackmun, 66 F.3d 1572, 1576 (11th Cir. 1995). Factors that are pertinent include: "the public interest served by the seizure, the nature and scope of the intrusion, and the objective facts relied upon by the officers." Id. (internal citation omitted). Further, "this Court has said

the fact that police handcuff the person or draw their weapons does not, as a matter of course, transform an investigatory stop into an arrest." Id. (internal citations omitted).  Stating a defendant's Miranda rights also does not necessarily transform an investigatory stop into an arrest.  United States v. Diaz-Lizaraza, 981 F.2d 1216, 1222 (11th Cir. 1993).

The Eleventh Circuit has further held that an investigatory stop does not become an arrest "despite the fact that a reasonable person would not believe he was free to leave." Blackmun, 66 F.3d at 1576.  So, in Blackmun, when law enforcement responded to a residence when they received information that a bank robbery had been committed, it was not unreasonable for the officers to order the defendants out of the house and to handcuff them.  Id.  The Court considered the fact that there were four male suspects, the violent nature of the offense, and the need for officer protection, in determining that ordering the defendants out of the house and handcuffing them did not elevate the investigatory stop into an arrest.  Id.  As the Court further explained,  "[c]aution was called for even at the investigatory stage." Id.  In another Eleventh Circuit case, Acosta, when law enforcement had reason to believe the defendant had been engaged in a drug transaction and was carrying a large amount of money, briefly detaining the defendant with his permission during the search of his car and the apartment from which he came did not amount to an arrest.  Acosta,

23

363 F.3d at 1145-48.   It was also reasonable for the officers to momentarily draw their weapons, as they would have been justified in suspecting that the defendant may have been armed.   Id. at 1147.

As noted above, the circumstances surrounding what officers believe to be drug related activity may also be pertinent to a consideration of the officers' conduct surrounding the Terry stop. So in Diaz-Lizaraza, in the context of an investigation into possible cocaine smuggling, the stop of the defendant did not become an arrest when the agents drew their weapons and patted down the defendant after he made a move toward his hip.   981 F.2d at 1221.   The Eleventh Circuit explained, "[d]rug dealing is known to be extremely violent, and this was a reasonable way for the agents to protect themselves from a possible concealed weapon."   Id.

Here, the conduct of the Officers and the circumstances surrounding their investigatory stop of Mr. Valerio did not amount to an arrest requiring probable cause.   First, the Officers relied on a number of objective facts necessitating their actions when they arrived at Defendant's home.   Blackmun, 66 F.3d at 1576. After the fruitless search of bay 14, law enforcement was still engaged in an open investigation into potential criminal activity of Defendant Valerio.   Law enforcement was aware of a number of factors pointing to Defendant Valerio's possible engagement in a grow operation, including: his presence at a hydroponics store and evasive behavior when leaving the store; his vehicle's lack of a

license plate, or alternatively, the bent license plate obscuring its identifying markers, solely during the time in which he was at the hydroponics store; and his presence at a warehouse, known to law enforcement to be the type of location conducive to marijuana grow operations.  The Officers also had information from Mr. Staska that he had seen Defendant Valerio spend time around the warehouse bays.  DE 60, at p. 156, ln. 4-25; id. at p. 157, ln. 1-20. Further, even though the search of bay 14 did not produce evidence of a marijuana grow operation, this fact is still important because bay 14 is located immediately next to bay 15, and thus, it is plausible that the K-9 alerted to bay 14 based on the presence of marijuana nearby, in bay 15.  Id. at p. 157, ln. 16-17; id. at p. 159, ln. 11-17.

The nature and scope of the intrusion also indicate that the stop did not rise to the level of an arrest.  Blackmun, 66 F.3d at 1576.  While the evidence does show that Agent Ahearn initially drew his weapon and held it at a "low rate position" when Defendant exited his residence, and then also conducted a pat down, these facts alone do not transform the stop into an arrest.  DE 60, at p. 72, ln. 4-12; id. at p. 99, ln. 6-25.  As Agent Ahearn testified, his weapon was drawn only momentarily, and upon noticing that Defendant was compliant, he re-holstered it.  Id. at p. 72, ln. 12-14.  Further, Agent Ahearn stated that he conducted the pat down to determine if Defendant was carrying a weapon.  Id. at p. 99, ln. 6-

25.

The Court finds that it was reasonable for an officer in this position to believe Defendant may have been armed, considering that law enforcement was engaged in an ongoing investigation into Defendant's purported drug operation.  Further, it is of no consequence that Agent Ahearn did not receive information that Defendant was in fact armed.  As the Supreme Court explained in Terry, "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." 392 U.S. at 27.  The Court also echoes the Eleventh Circuit in reiterating that "[d]rug dealing is known to be extremely violent" and so drawing a weapon and conducting a pat down are "reasonable way[s] for [law enforcement] to protect themselves from a possible concealed weapon." Diaz-Lizaraza, 981 F.2d at 1221.  See also United States v. Thomas, 242 F.3d 1028, 1032 n. 5 (11th Cir. 2001) (citation omitted) (holding that "[f]irearms are known 'tools of the trade' of narcotics dealing because of the dangers inherent in that line of work.").  The Court thus finds that these methods of ensuring officer safety were reasonable.

Defendant Valerio has pointed to the fact that the Officers' vehicles may have been parked in front of Defendant's driveway, in such a way that Defendant would not have been able to leave.  DE

26

60, at p. 171, ln. 3-7.  Yet, as previously noted, an investigatory stop does not become an arrest "despite the fact that a reasonable person would not believe he was free to leave."  Blackmun, 66 F.3d at 1576.  Further, while Ms. MacDonald recalls that there were three to four police vehicles at the Valerio residence, according to the Officers there were only two police vehicles present at the house.  DE 60, at p. 77, ln. 3-9.  Agent Ahearn and Detective Lopez arrived at the Valerio residence in the same vehicle, and subsequently Officer Grant was called to the scene as backup.  Id. at p. 77, ln. 3-9.  Nonetheless, even if three vehicles were blocking Mr. Valerio's access to the street, the governing test does not ask whether Defendant subjectively believed himself to be constrained.  Blackmun, 66 F.3d at 1576.  In Blackmun, for example, the defendants were actually handcuffed, thus severely limiting their mobility, and this restraint did not transform that stop into an arrest.  Id.  Further, there is no indication from the record that Defendant attempted to leave or wanted to——Defendant was allegedly calm and cooperative throughout the entire interaction with the Officers and agreed to the search of his car and the warehouses.  DE 60, at pp. 74-77.

The facts as revealed during the Hearing show that while the interaction between Defendant Valerio and the Officers may be described as more than a consensual citizen encounter, it did not rise to the level of an arrest requiring probable cause.  The

27

Officers' conduct was not so excessive or intrusive so as to trigger the full protection of the Fourth Amendment. <u>Hayes</u>, 470 U.S. at 815-16. Instead, the Officers responded reasonably to intelligence they had gathered regarding Defendant Valerio's potential involvement in a drug operation. Shortly after arriving on the scene and taking steps to ensure their safety, they spoke with Defendant who admitted to the very drug activity suspected by law enforcement. The Court thus funds that this interaction is not the type of intrusion requiring probable cause.

### III. Defendant's Untimely Fifth Amendment Argument

At the Sentencing Hearing held on April 17, 2012, Defendant re-stated the grounds for his Motion To Suppress (DE 35). According to Defendant, one such ground was a Fifth Amendment challenge to the evidence gained from the consent to search the warehouse bays on August 24, 2011. Defense Counsel stated:

> We also contest the voluntariness of the consent based on the facts and circumstances of him being confronted by law enforcement with a firearm. We believe that any consent he would have given, separate and apart from the Fourth Amendment violation, would have been involuntary pursuant to the Fifth Amendment. . . . We are objecting both on Fourth Amendment grounds and then Fifth Amendment grounds that the——even if the Court believed that the stop was valid under the Fourth Amendment it still violates the Fifth Amendment in that the circumstances, the show of authority to Mr. Valerio at the time that he was confronted by law enforcement, would have rendered any consent thereafter involuntary.

The Court finds that this statement was the first time Defendant

adequately articulated any suppression argument on Fifth Amendment grounds. Therefore, the Court finds that this argument was waived, and the Court will not consider it in ruling on Defendant's Motion (DE 35). See United States v. Holsey, 264 Fed. App'x 839 (11th Cir. 2008) (holding that a motion to suppress certain evidence must be made prior to trial).

## A. Requirement of Specificity

In the Eleventh Circuit, a motion to suppress "must in every critical respect, including allegations of standing, be sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented." United States v. Ford, 34 F.3d 992, 994 (11th Cir. 1994) (internal citations omitted). See also Access Now, Inc. v. Southwest Airlines Co., 385 F.3d 1324, 1330 (11th Cir. 2004) (holding that "the law is by now well settled in this Circuit that a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.").

Thus, in United States v. Cooper, the Eleventh Circuit held that the motion to suppress at issue did not include sufficient facts demonstrating that the defendants had a reasonable expectation of privacy in the hotel room that was searched, and so the motion was properly denied. 203 F.3d 1279, 1284 (11th Cir. 2000). The defendants in Cooper included "numerous references to

the hotel room as 'theirs,'" but did not allege the requisite indicia of a reasonable expectation of privacy, such as "whether the individual paid and/or registered for the room or whether the individual's personal belongings were found inside the room." Id. (internal citations omitted). See also United States v. Jones, 241 Fed. App'x 676, 678 (11th Cir. 2007) (holding that a district court did not abuse its discretion in denying a motion to suppress that was "completely conjectural and wholly lacked the detail that we require") (citing Cooper, 203 F.3d at 1284); United States v. Ortiz-Aleman, 2011 WL 3739528, at *2 (N.D. Ga. July 21, 2011) (finding that the defendant waived two arguments in his motion to suppress when he did not "present sufficient facts and legal authority demonstrating his entitlement to relief").

Courts have also understood Federal Rules of Criminal Procedure 12(b)(3)(C) and 12(e) to mandate that an untimely issue or argument for suppressing evidence is waived if it is not made before trial. Under Rule 12(b)(3)(C), a motion to suppress evidence must be raised before trial, and under 12(e), "[a] party waives any Rule 12(b)(3) defense, objection, or request not raised by the deadline the court sets under Rule 12(c) or by any extension the court provides." Rule 12(e) also provides that "[f]or good cause, the court may grant relief from the waiver." Thus, in United States v. Mwangi, the District Court did not allow the defendant to raise a Fourth Amendment issue after the evidentiary

30

hearing was held because "the defendant's motion and the evidentiary hearing did not raise Fourth Amendment issues or issues relating to tainted statements."  2010 WL 520793, at *5 (N.D. Ga. Feb. 5, 2010).  The court reasoned that "[n]either the government nor the Court were on notice that Mwangi challenged his statements as fruits of a purported Fourth Amendment violation and he will not be heard to raise such a claim after the evidentiary hearing record is closed."  Id.  Therefore, the Fourth Amendment argument for suppression of evidence was waived under Rules 12(b)(3)(C) and 12(e).  Id.  See also United States v. Gambino-Zavala, 539 F.3d 1221, 1227 n.2 (10th Cir. 2008) (holding that the waiver provision of Rule 12(e) "applies not only to the failure to make a pretrial motion, but also to the failure to include a particular argument in the motion" and "[t]o avoid waiving an argument, the defendant must make sufficiently definite, specific, detailed and nonconjectural factual allegations supporting the suppression claim.") (internal citation and quotation marks omitted).

The Court understands Defendant's Motion To Suppress (DE 35), in all respects, to be a motion to suppress evidence under the Fourth Amendment.  The Motion says as much itself in the opening line: "The defendant, Robert Valerio, through counsel respectfully moves pursuant to Rule 12(b)(3), Fed. R. Crim. P., and the Fourth Amendment of the United States Constitution, to suppress evidence and statements obtained as a result of an illegal search and

seizure, . . ." DE 35 at p. 1.   Defendant then devotes his entire
seven-page Motion to Fourth Amendment arguments based on Fourth
Amendment case law.   Nowhere in Defendant's Motion (DE 35) does he
state that he is moving to suppress statements under the Fifth
Amendment.   Further, nowhere in Defendant's closing argument at the
Hearing did Counsel for Defendant Valerio argue that the evidence
was obtained in violation of the Fifth Amendment.   See DE 60 at pp.
186-202.   Similarly, any argument as to the Fifth Amendment was
absent from the Government's Response (DE 43) and the Government's
closing argument at the Hearing.   See DE 60 at p. 176, ln. 15-19;
id. at p. 181, ln. 19-21 (in which the Government stated in closing
argument: "Rather the issue before the Court is very simple.   There
are two questions that Your Honor must answer.   The first of which
is whether or not there was a reasonable suspicion to conduct a
Terry stop which occurred at the Valerio home. . . . The next
question is whether or not the Agents were reasonable during the
course of the execution of the Terry stop.").

While Defendant failed to include any specific reference to
the Fifth Amendment in his Motion (DE 35), he did include the
following three sentences toward the end of the Motion:

> When an individual has been unlawfully stopped and
> detained the consent will generally be deemed to be the
> product of the unlawful detention.   United States v.
> Santa, 236 F.3d 662 (11th Cir. 2000); Unites States v.
> Miller, 821 F.2d 546 (11th Cir. 1987); United States v.
> Thompson, 712 F.2d 1356 (11th Cir. 1983); United States

> v. Valdez, 931 F.2d 1448 (11th Cir. 1991); Florida v.
> Royer, 460 U.S. 491 (1983).   Finally, Mr. Valerio's
> statements resulted from custodial interrogation that
> followed his illegal stop, seizure and arrest. As such,
> the statement must be suppressed. Brown v. Illinois, 442
> U.S. 590 (1975); Dunaway v. New York, 442 U.S. 200
> (1979).

DE 35 at p. 6.  The Court finds that these three sentences clearly

represent a Fourth Amendment attack on the illegality of the stop,

which eventually led to Mr. Valerio confessing to operating a

marijuana grow operation and consenting to the search of said

operation.   Further, all of the cases cited above concern the

proposition that when a stop or seizure is illegal under the Fourth

Amendment, any resulting confession or consent may be irreparably

tainted by the illegal search or seizure.

### B. The Taint of Any Alleged Stop

The aforementioned cases Defendant relies upon stand for the

proposition that assuming law enforcement has conducted an

unconstitutional stop or seizure under the Fourth Amendment, a

subsequent confession or consent to search may be tainted as fruit

of the unlawful search or seizure under Wong Sun v. United States,

371 U.S. 471 (1963).  In Brown v. Illinois, which Defendant cites,

the Supreme Court held that "Miranda warnings, by themselves, under

Wong Sun [do not] always purge the taint of an illegal arrest."

422 U.S. 590, 605 (1975).  As the Court further explained,

> The Miranda warnings are an important factor, to be sure,

33

> in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, and particularly, the purpose and flagrancy of the official misconduct are all relevant. The voluntariness of the statement is a threshold requirement.

Id. at 603-04 (internal citations omitted). Further, in Dunaway v. New York, which Defendant cites, the Supreme Court explained the relationship between a confession obtained following an illegal search or seizure: "Consequently, although a confession after proper Miranda warnings may be found 'voluntary' for purposes of the Fifth Amendment, this type of 'voluntariness' is merely a 'threshold requirement' for Fourth Amendment analysis. Indeed, if the Fifth Amendment has been violated, the Fourth Amendment issue would not have to be reached." 442 U.S. 200, 217 (1979).

The remaining cases cited by Defendant all involve the Fourth Amendment. United States v. Santa, 236 F.3d 662, 676 (11th Cir. 2000) (citing Brown and Dunaway in holding that "a voluntary consent to search does not remove the taint of an illegal seizure"; a court must also look to the factors set forth in Brown to determine whether the consent was obtained from "exploitation" of the illegal search); United States v. Miller, 821 F.2d 546 (11th Cir. 1987) (holding that there were not sufficient intervening circumstances between an illegal stop under the Fourth Amendment and a subsequent consent to search to make the search "voluntary");

United States v. Thompson, 712 F.2d 1356 (11th Cir. 1983) (holding that the defendant's consent to search the contents of a vial was tainted by the illegal detention of the defendant); United States v. Valdez, 931 F.2d 1448 (11th Cir. 1991) (holding that a motorist's consent to a search of his vehicle was tainted by the initial illegal stop of the vehicle); Florida v. Royer, 460 U.S. 491, 501 (1983) (holding that the confinement of a defendant was illegal under the Fourth Amendment, and thus the defendant's ensuing consent to search his luggage was "tainted by the illegality"). Moreover, Defendant uses these citations to support a Fourth Amendment argument——that "[w]hen an individual has been unlawfully stopped and detained the consent will generally be deemed to be the product of the unlawful detention." Thus, the Court construes this argument and its supporting citations as addressing the Fourth Amendment claim.

In order to have stated a Fifth Amendment argument, Defendant would have had to include facts that would support his contention that a Fifth Amendment violation had occurred. But nowhere in his Motion (DE 35) does Defendant set forth facts supporting a challenge to the voluntariness of his statements or his consent under the Fifth Amendment. In addition, Defendant would have had to include the proper legal authority in order to mount a Fifth Amendment challenge. For example, in the Eleventh Circuit, the standard for determining whether a defendant is "in custody" prior

to his arrest is whether "under the totality of the circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom of movement to such an extent that he would not feel free to leave." <u>United States v. Brown</u>, 441 F.3d 1330, 1347 (11th Cir. 2006). This totality of the circumstances inquiry asks whether a reasonable person would have "understood his freedom of action to have been curtailed <u>to a degree associated with formal arrest</u>" by looking at factors such as whether the officers brandished weapons, whether they touched the suspect, and whether they "used language or a tone that indicated that compliance with the officers could be compelled." <u>United States v. Luna-Encinas</u>, 603 F.3d 876, 881 (11th Cir. 2010) (emphasis in original) (internal citations omitted).

Defendant did not recite this Fifth Amendment standard in his Motion (DE 35), nor he did not provide any facts supporting such a claim. While it may be argued that some of the facts concerning the issue of the propriety of the <u>Terry</u> stop could theoretically overlap with the facts concerning whether Defendant was "in custody" for purposes of the Fifth Amendment, Defendant nonetheless did not raise such facts in either his Motion (DE 35) or at the Hearing. The Government also did not address the question of custodial interrogation, presumably because it was not apprised of the fact that Defendant was raising a Fifth Amendment challenge. Thus, the Court is left with no facts or argument from either Party

36

regarding whether a reasonable person in Defendant's position would have felt "his freedom of action [had] been curtailed to a degree associated with formal arrest."   Luna-Encinas, 603 F.3d at 881 (emphasis in original).   It would be a far stretch for the Court to construe an independent Fifth Amendment challenge from the three lines set out in Defendant's Motion (DE 35).   The Court would have to articulate the Fifth Amendment argument, case law, and factual support for the Defendant's argument on its own.   The Court declines to do so.

The Court thus finds that any possible Fifth Amendment argument as to the custodial interrogation of Defendant has been waived.   See Fed. R. Crim. P. 12(b)(3)(C), 12(e).   The Court construes Defendant's argument in the three lines set out above to be as follows: Defendant's confession of the marijuana operation, and his consent to the search of the marijuana operation, were tainted by the illegality of the stop of Defendant in his driveway on August 24, 2011, and were therefore fruit of the poisonous tree. However, as explained in Section II of this Order, the Court finds that under a Fourth Amendment analysis, there was reasonable suspicion to stop Defendant and the conduct of the Officers did not elevate the stop into an arrest requiring probable cause. Therefore, any evidence flowing from that initial stop was properly obtained.

<u>IV. Conclusion</u>

Upon considering the totality of the record testimony and evidence, the Court finds that the Government has met its burden in showing that there was reasonable suspicion to stop Defendant Valerio under <u>Terry</u>, and that the circumstances surrounding the stop and the conduct of the Officers did not transform the stop into an arrest requiring probable cause. <u>Nix</u>, 467 U.S. at 444 n. 5. Therefore, Defendant Robert Valerio's Motion To Suppress Evidence And Statements Obtained As A Result Of An Illegal Search And Seizure And Request For Hearing (DE 35) will be denied.

Accordingly, after due consideration, it is

**ORDERED AND ADJUDGED** that Defendant Robert Valerio's Motion To Suppress Evidence And Statements Obtained As A Result Of An Illegal Search And Seizure And Request For Hearing (DE 35) be and the same is hereby **DENIED**.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this ___24th___ day of April, 2012.

_William J. Z_

WILLIAM J. ZLOCH
United States District Judge

Copies furnished:

All Counsel of Record

38